UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 09-131-P-H |
| | ) | |
| LISAMARIE LEIGHTON, | ) | |
| | ) | |
| Defendant | ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

The defendant, charged with making an apartment available for use in manufacturing, storing, and distribution of a controlled substance, in violation of 21 U.S.C. § 856(a)(2), Indictment (Docket No. 17), moves to suppress statements she made to two deputy sheriffs on June 6, 2008. An evidentiary hearing was held before me on October 28, 2009, at which the defendant appeared with counsel. Two witnesses testified for the government; five exhibits offered by the government were admitted, four without objection; and the defendant testified on her own behalf. I recommend that the following findings of fact be adopted, and that the motion be denied.

**I. Proposed Findings of Fact**

On June 6, 2008, Sergeant Michael Hayes of the York County Sheriff's Office, who was then assigned to the Drug Enforcement Administration Task Force and had been employed by the Sheriff's Office for 10 years, decided to interview the defendant, whose name and address had come up in the Task Force's investigation of a man named Josh, with whom the defendant had been romantically involved. When he left the sheriff's office around noon, he was accompanied by Detective Steven Thistlewood of the York County Sheriff's Office, in

1

accordance with that office's policy to have two agents at interviews whenever possible. Hayes drove to Allen Street in Sanford in an unmarked PT Cruiser. He and Thistlewood were wearing plain clothes and their guns were concealed. Hayes was not carrying handcuffs.

Hayes went to the door of 14 or 16 Allen Street and was informed by a man whose name he did not recall that the defendant was not there. Hayes and Thistlewood left. In fact, the defendant was sleeping in a bedroom in that residence at the time. The man who had spoken with Hayes, Dale Spinney, woke the defendant and told her that Hayes had said that the officers would return in half an hour. Hayes and Thistlewood returned to the residence about 25 minutes after their first visit.

They found the defendant outside the residence. She had waited for them on the porch because she did not want the son of James, with whom she was living, to see her talking with the police. Hayes got out of his car and spoke briefly with the defendant. He identified himself and Thistlewood as law enforcement officers. The defendant thought that the officers wanted to talk to her about a warrant for her arrest for an unpaid fine, which she had just paid. Hayes asked the defendant to speak with him in the PT Cruiser for more privacy, and she agreed. She got into the front passenger seat, Hayes got into the driver's seat, and Thistlewood was in the back seat behind the defendant.

Because both the defendant and the officers preferred to conduct the interview where they could not be seen by other residents of the Allen Street apartment or by neighbors, Hayes drove approximately four-tenths of a mile to the parking lot of Metrocast Cablevision. The officers had not planned in advance to go to that parking lot. At no time was the defendant handcuffed or were the doors of the PT Cruiser locked. Hayes repeatedly told the defendant that she was free to leave at any time. He also told the defendant that she did not have to answer the

officers' questions and that, whatever her answers were, she would not be arrested that day. At no time did either officer threaten the defendant or promise her leniency. The defendant told the officers, "You guys scare me." Immediately after she said this, Hayes told the defendant that she was free to go. Hayes knew that it was possible that the defendant would incriminate herself in her answers to the questions that he planned to ask her. At no time did the defendant know whether the officers were carrying guns.

The Allen Street residence and the Metrocast parking lot are marked on Government Exhibit 1 with yellow pins. There were several other vehicles in the parking lot that day.

Hayes and Thistlewood both believed that the defendant was able to understand them, and she did not appear to be under the influence of drugs or alcohol. The conversation in the parking lot was recorded on a digital recorder that was located on the center console of the car, between Hayes and the defendant. No investigative questions were asked of the defendant before the recorder was turned on. The defendant, who was 21 years old at the time of the interview, testified that she was not aware that the conversation was being recorded. She told Hayes and Thistlewood that she had a mental disability but that the medications she took for that condition would not affect her ability to speak with them. Throughout the interview, the defendant never appeared confused, never said that she did not understand something that either Hayes or Thistlewood said, never said that she wanted to stop talking with them, and never acted in a manner that caused either of them any concern. Neither raised his voice during the conversation. The defendant remembered that Hayes told her that he did not even have any handcuffs with him that day.

"Josh" was the target of Hayes's investigation, and the defendant said that she knew why Hayes wanted to talk to her about "Josh," because she knew that he had been involved in illegal

activity.  During the interview the defendant said that "Josh" sold coke out of her former apartment, "that's where he lives."  After the interview, which lasted about 35 minutes, Hayes drove the defendant back to the Allen Street residence.  During this drive, he asked the defendant if she would mind if the officers called her again with more questions, and she said that she would not mind.

Just before the end of the taped portion of the interview, Hayes asked the defendant not to tell others about the subject matter of their interview, a request that he and Thistlewood make of those they interview in most investigations.  The defendant then asked, "What do I say to my family when I get back there?"  The officers helped her to make up a story for this purpose that involved counterfeit bills, because she had just cashed her Social Security check.

The defendant was declared fully disabled by dysthymia, bipolar disease, and anxiety when she was 17 years old.  She spent three months in the Spring Harbor mental hospital.  The medications she takes make her anxious and give her mood swings.  They have caused her to lose her memory at times.

The defendant testified that before the taped portion of their conversation, she asked the officers whether she should get an attorney, Transcript at 92, or if she needed a lawyer, *id*. at 102, but she did not recall their answer, if any, *id*. at 105.[1]  Hayes testified that the defendant never asked for an attorney.  The defendant testified that while they were in the parking lot, the officers told her that she could leave but that, if she did, she would have to walk back to the Allen Street residence.

---

[1] In subsequent questions to witnesses, and in his oral argument, the defendant's attorney asserted that the defendant had "asked for an attorney." Transcript at 104, 113, 114, 116.  But the defendant did not testify that she asked for an attorney.  She testified that she asked whether she should get an attorney or if she needed a lawyer.  For purposes of a motion to suppress statements, these questions are legally distinct from a request for an attorney.  *See, e.g., United States v. Felner*, Criminal Action No.3:08CR-119-S, 2009 WL 1542710 (W.D.Ky. June 2, 2009), at *2, *5-*6; *United States v. Akpan*, No. 2:05-cr-00304-RCJ-RJJ, 2009 WL 418599 (D.Nev. Feb. 17, 2009), at *21, *27-*28; *United States v. Gibson*, 108 Fed.Appx. 975, 976, 2004 WL 2093970 (5th Cir. Sept. 21, 2004), at **1; *United States v. Ogbuehi*, 18 F.3d 807, 813 (9th Cir. 1994).

## II.  Discussion

### A.  Custodial Interrogation

The defendant first argues that any incriminating statements that she may have made to Hayes and Thistlewood on June 6, 2008 were obtained in violation of her constitutional rights, as she was held in the equivalent of custody during the interrogation but never informed of her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  Motion at [2]-[3].  *Miranda* warnings are required when a suspect is in custody and subjected to police interrogation.  *Illinois v. Perkins*, 496 U.S. 292, 296 (1990).  A custodial situation arises where there is a formal arrest or restraint on the suspect's freedom of movement of the degree associated with a formal arrest.  *United States v. Quinn*, 815 F.2d 153, 160 (1st Cir. 1987).

Whether a person can be considered to have been in custody depends on all of the circumstances surrounding the interrogation.  *Stansbury v. California*, 511 U.S. 318, 322 (1994).  This determination hinges "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id*. at 323.  *See also Quinn*, 815 F.2d at 157 (relevant inquiry "is how a reasonable [person] in the suspect's position would have understood his [or her] situation") (citation and internal quotation marks omitted).

"Among the factors to consider" in making a *Miranda* custody determination "are whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation."  *United States v. Nishnianidze*, 342 F.3d 6, 13 (1st Cir. 2003) (citation and internal quotation marks omitted).

Here, the defendant was questioned in neutral, if not familiar, surroundings. She and the officers were only four-tenths of a mile from the defendant's residence, in a parking lot that she readily identified as "the Metrocast lot." She and the officers were inside an unmarked car, parked at midday in a lot where several other vehicles were parked. Only two law enforcement officers were present, and they repeatedly told the defendant that she was free to leave at any time.[2] The defendant did not know whether either of the officers, both of whom were dressed casually, was carrying a weapon. Hayes told the defendant that she would not be arrested that day, no matter what she said to him and Thistlewood. The defendant had not been ordered into the car for the short drive; both she and the officers believed it was better for the interview to be conducted some distance away from her residence. No physical restraint was placed on the defendant at any time, and the interview lasted about 35 minutes, after which the officers returned the defendant to her residence. During the interview, the defendant was neither threatened nor promised leniency. She never told the officers that she wanted to stop the interview or leave the car.

The defendant testified repeatedly that she did not feel free to leave the PT Cruiser or to terminate the interview, and her attorney emphasized this testimony in his oral argument. However, the legal test for the existence of custody is not a subjective one. I have no difficulty concluding, based on the evidence presented, that a reasonable person in the defendant's position

---

[2] In his oral argument, counsel for the defendant emphasized that it was "a hot June day," suggesting that the defendant was not free to leave the PT Cruiser because of the fact that it was "quite some distance from her home in her condition on a hot June day is not going to make it particularly easy for her to walk home." Transcript at 114-15. In fact, only the defendant agreed with him, although he asked all three witnesses, that it was an unusually hot day, *id*. at 43, 78, 92; the defendant did not testify about any physical limitation or disability that would have made it difficult for her to walk four-tenths of a mile; and none was apparent as she moved around the hearing room and testified. The street had sidewalks. Her attorney also suggested that the officers should have gotten out of the car once it was parked and interviewed the defendant at the side of the lot, *id*. at 125, an argument that is at odds with his prior argument about the unusual heat that day. In any event, a non-custodial interview is not rendered custodial merely because the officer does not get out of the vehicle, open the door for the interviewee, and escort her out, or because the officer does not say explicitly that he would drive her home whenever she asked. *Id*. at 115.

would have understood that she was free to leave the car at any time during the interview. *Quinn*, 815 F.2d at 157. The fact that the officers did not tell the defendant at the very beginning of the recorded portion of their conversation that she was free to leave and did not have to answer their questions, a fact highlighted by her attorney, makes no difference. Hayes testified that he had told her this earlier, and he can be heard on the tape repeating it. Nor is the fact that a PT Cruiser is a compact automobile legally significant. Similarly, the fact that the agents asked the defendant not to tell others about the subject matter of their conversation, and helped her to devise a "cover story" to tell others, as they do with most interviewees, is not evidence of custody or coercion.

The questioning, assuming that it constituted interrogation, was not custodial. *See United States v. Plumman*, 409 F. 3d 919, 922, 924-25 (8th Cir. 2005) (where defendant was told he was not under arrest and would not be arrested after interview, sat in front passenger seat of agent's vehicle parked in defendant's driveway for three and one-half hours during daytime in full view of passing traffic with one agent in driver's seat and a second in back seat behind him, never refused to answer questions or asked to leave vehicle, was not handcuffed or physically restrained, and did not see any weapons inside vehicle, interrogation was not custodial); *United States v. Scheets*, 188 F.3d 829, 833-34, 840-41 (7th Cir. 1999) (defendant who was not allowed to leave casino security office despite being told he was not under arrest and was free to leave, and then met with detective in agent's car not in custody). *See also United States v. McCarty*, No. CRIM.05-09-B-W, 2005 WL 1745652 (D. Me. July 25, 2005), at *5 (defendant who had been handcuffed not in custody after handcuffs removed and being told that he was free to leave, was not under arrest, and did not have to answer any questions).

## B. Voluntariness

The defendant also contends that any incriminating statements she made to Hayes and Thistlewood were involuntary and must be suppressed for that reason. Motion at [4]. She asserts that the facts recounted above, "coupled with the fact that Defendant has a history of mental illness, a history Agent Hayes was well aware of, seriously place into question whether Defendant voluntarily agreed to talk with Agent Hayes." *Id*. She also argues, without citation to authority,[3] that the government must prove beyond a reasonable doubt that any such statements were made voluntarily. *Id*. In fact, the burden on the government is to prove by a preponderance of the evidence that the statements were voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

A confession must be voluntary to be admissible. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). In the face of a defendant's claim that her confession was extracted involuntarily, the government bears the burden of showing, based on the totality of the circumstances, that investigating agents neither "broke" nor overbore her will. *Chambers v. Florida*, 309 U.S. 227, 239-40 (1940). The voluntariness of a statement or confession does not depend on the defendant's having been informed that he or she was free to decline to answer questions. *United States v. Mendenhall*, 446 U.S. 544, 555 (1980). If there is evidence of objectively coercive police conduct, the personal characteristics of the accused must also be factored in. *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963). A defendant's mental state, by itself and apart from its relation to official coercion, never disposes of the inquiry into constitutional voluntariness. *United States v. Palmer*, 203 F.3d 55, 61-62 (1st Cir. 2000).

Here, there is no evidence that Hayes or Thistlewood engaged in any coercive activity. They did not order the defendant to do anything; they did not threaten her; they made her no

---

[3] At oral argument, in rebuttal, the defendant's attorney said that "*United States v. Zerbst*, 1938" requires the government to prove voluntariness beyond a reasonable doubt. The opinion in *Johnson v. Zerbst*, 304 U.S. 458 (1938), does not impose such a standard of proof.

promises of leniency. They told the defendant that she was not required to answer their questions and that she could leave the car at any time. They told her that she would not be arrested, whatever she said to them. From all that appears, the entire conversation was low key. The elapsed time before the defendant made any incriminating statement was about 35 minutes.

In this regard, the defendant relies heavily on the assertions that she had "a history of mental illness;" that she had been "declared totally disabled" (presumably by the Social Security Administration) due to the mental impairments of dysthymia, bipolar disorder, anxiety, and insomnia; that she took medications for these impairments that made her anxious, gave her mood swings, and sometimes caused her to lose her memory; and that Hayes was "well aware of" these facts. Since there is no evidence of any other type of coercion by the agents, she apparently intends that the court find that Hayes's awareness caused him to use questioning tactics that, while not coercive with individuals who do not suffer from these mental impairments, were clearly coercive as applied to someone with such impairments.

Hayes testified credibly that he was not aware that the defendant suffered from any mental disability until she told him so, and that she took medication for these conditions, early in the conversation. He then asked her whether the medications affected her ability to tell the truth, or to speak with the agents, and she said, "No." He and Thistlewood both testified, again fully credibly, that the defendant did not appear to have any difficulty understanding them, did not appear to be under the influence of drugs or alcohol at the time, never appeared confused, and did not say that she did not understand any of their questions. The defendant's demeanor and performance while testifying at the hearing was very similar to that described by the officers. Under these circumstances, Hayes had no reason to be deceptive or manipulative with the

defendant, let alone psychologically coercive. *See generally United States v. Rojas-Tapia*, 446 F.3d 1, 7-8 (1st Cir. 2006).

None of the mental impairments mentioned by the defendant necessarily made her more susceptible to psychological manipulation, and the defendant did not so testify. Dysthymia is "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness[.]" Stedman's Med. Dictionary 556 (27th ed. 2000). Bipolar disorder is defined as "a recurrent mood disorder featuring one or more episodes of mania or mixed episodes of mania and depression." U. S. Dep't of Health and Human Services, Mental Health: A Report of the Surgeon General 246 (1999). Anxiety is an amorphous concept, including many different mental states and manifestations. Insomnia is sleeplessness. The defendant could have suffered from all of these impairments and still have had no difficulty understanding the agents' questions and explanations adequately, and answering their questions truthfully. From all that appears, she did. Her attorney's contention during oral argument that the defendant "doesn't have the mental capacity to realize" that she was going to incriminate herself if she told the agents the truth or expose herself to potential criminal liability if she lied to them grafts onto the concept of voluntariness a requirement not recognized by federal law. And, in any event, there was no evidence to support this characterization of the defendant's mental state.

The government has carried its burden of demonstrating that any incriminating statements made to Hayes and Thistlewood by the defendant on June 6, 2008, were not involuntary.

### III.  Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact be adopted and the motion to suppress be **DENIED.**

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 27th day of November, 2009.

>                     /s/  John H. Rich III
>                     John H. Rich III
>                     United States Magistrate Judge